IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| **PATRICIA SAMS,** | } |
| | } |
| Plaintiff, | } |
| | } |
| v. | }   Case No.: 2:11-CV-0766-RDP |
| | } |
| **PROTECTIVE LIFE CORPORATION,** | } |
| | } |
| Defendant. | } |

### MEMORANDUM OPINION

This matter before the court invokes the age-old question: If a tree falls in a forest and no one is around to hear it, does it make a sound? In the present context, the question should be rephrased: If a party files a motion for summary judgment and the other does not respond, is there a genuine dispute of material fact? This question arises in the context of Defendant's Motion for Summary Judgment. (Doc. # 11). Plaintiff has failed to respond to Defendant's motion, even after being granted an extension of time and being reminded via email that she could file her response by mail. (Doc. # 14 at 1). After careful consideration of Plaintiff's Amended Complaint, Defendant's brief in support of this motion, the relevant law, and the record as a whole, the court finds that there are no disputed issues of material fact and Protective is entitled to judgment as a matter of law on Plaintiff's claims under the Family Medical Leave Act ("FMLA") and the Americans with Disabilities Act ("ADA"). Accordingly, Defendant's Motion is due to be granted.

I.     **BACKGROUND**

Plaintiff Patricia Sams ("Plaintiff") brings this action against Defendant Protective Life Corporation[1] ("Protective") asserting one count of wrongful termination under the FMLA, one count of wrongful termination under the ADA, and three counts of disability discrimination under the ADA. (Doc. # 2 at 4-5). Plaintiff began her most recent employment with Protective in 1999. The decision to terminate her employment was made on November 23, 2009, but that decision was not communicated to Plaintiff until December 2, 2009. (Doc. # 13-1 at 4, 38; Doc. # 13-9 at 13-14; Doc. # 13-10 at 3-4; Doc. # 13-11 at 9).

Plaintiff asserts that she is disabled because she cannot sit or type for extended periods of time due to back pain. (Doc. # 13-1 at 9-10). Protective was aware of these issues and attempted to accommodate Plaintiff's needs by allowing her to take breaks to stretch and move around. In addition, Protective bought a special ergonomic chair for Plaintiff. (Doc. # 13-1 at 12, 28-29; Doc. # 13-10 at 3). Despite her limitations, Plaintiff was always able to perform her job at Protective. (Doc. # 13-1 at 12).

In the summer of 2009, Plaintiff decided to leave the Support Team – where she was working at that time – and apply for a more challenging position on the Special Processing Team. (Doc. # 13-1 at 15, 17). Jobs working with the Special Processing Team are classified as Service Team positions, and Service Team positions are generally regarded as more demanding and challenging than Support Team positions. (Doc. # 13-11 at 3; Doc. # 13-10 at 2). During two interviews for the position, Plaintiff was informed by Andrea Nichols (the Customer Service Manager) of the job

---

[1] Protective Life is an insurance company with its corporate headquarters in Birmingham, Alabama. (Doc. # 12 at 4).

description for the new position and the various duties it entailed. (Doc. # 13-1 at 17; Doc. # 13-4 at 17; Doc. # 13-11 at 2). Ms. Nichols also informed Plaintiff that she would be required to undergo training with other customer service teams, such as the Quick Response Team, to prepare for the new position, and that this training was for her own benefit since she would be required to know all of the processing skills for the new position. (Doc. # 13-11 at 2-3; Doc. # 13-7 at 39-40).

On July 10, 2009, Ms. Nichols and Crystal Lent, Human Resources Partner, offered Plaintiff the position on the Special Processing Team, provided her with a training schedule, and instructed her to begin training with the Quick Response Team. (Doc. # 13-1 at 19; Doc. # 13-10 at 2; Doc. # 13-11 at 2-3). Plaintiff was the first new employee to join Special Processing since a new training program was created. (Doc. # 13-11 at 3). Every employee hired after Plaintiff with no prior experience on a Service Team was required to undergo similar specialized training. (*Id.*).

Plaintiff understood that the time frame for training in each area was flexible according to her ability to learn and process each task and that completing all of the training would help her transition effectively into the Special Processing Team. (Doc. # 13-1 at 19; Doc. # 13-4 at 19; Doc. # 13-10 at 2; Doc. # 13-11 at 2-3). On July 13, 2009, Plaintiff accepted the position with no further questions. (Doc. # 13-1 at 20; Doc. # 13-10 at 2; Doc. # 13-11 at 3). Within two weeks of Plaintiff's departure from the Support Team, her former position was filled, leaving no available positions to which she could return. (Doc. # 13-10 at 3).

Throughout the month of August 2009, Plaintiff received one-on-one training from Chairyll Barr on the Quick Response Team, and also attended cross-training classes with the Special Processing Team. (Doc. # 13-1 at 20-22, 48). However, Ms. Nichols told Plaintiff that she was ineligible for overtime and instructed her not to do any of the homework for the cross-training

classes until she was up to speed on her other training. (Doc. # 13-1 at 170-72; Doc. # 13-11 at 4). Ms. Barr also informed Plaintiff that members of the Quick Response Team were expected to maintain at least an 85% productivity rating and process 12 items per hour. (Doc. # 13-1 at 22-23).

Plaintiff's job performance reports from August 10, through November 18, 2009 show that she repeatedly failed to meet the productivity and processing requirements for the job. (Doc. # 13-5 at 27, 39; Doc. # 13-6 at 8, 10, 21, 39; Doc. # 13-7 at 42; Doc. # 13-8 at 8, 28, 41). In their meetings, Ms. Nichols repeatedly advised Plaintiff on how she might improve her productivity. (Doc. # 13-11 at 4-7). As of September 10, 2009, Plaintiff also had 15 attendance violations, which prompted Ms. Nichols to suggest that Plaintiff see Human Resources about applying for coverage under the FMLA. (Doc. # 13-11 at 6). Plaintiff followed Ms. Nichol's advice and obtained FMLA forms from Priscilla Dempsey in HR soon thereafter with the instructions to return them to HR after her doctor filled them out. However, Plaintiff testified that her doctor's office somehow lost those forms. Plaintiff then obtained a second set of FMLA forms from Ms. Dempsey in October 2009, and a third set in November 2009. (Doc. # 13-1 at 29-30).

On October 19, 2009, Plaintiff met with Ms. Nichols, Ms. Lent, and Patrick West, Vice-President of the Insurance Administration ("IA") Department to discuss her two month performance review, which was the lowest she had ever received. (Doc. # 13-1 at 33-34; Doc. # 13-7 at 39-40). Plaintiff complained that she had not been provided clear information about the training plan before accepting the job and asked why she was the only one required to complete the training plan. Protective reminded her that she was provided with a written training plan during the interview process, and explained that she was the first person to join the Special Processing Team since the new training program was created. Protective praised the *quality* of Plaintiff's work, but noted that

4

her *productivity* was in need of improvement. Plaintiff was also reminded that she needed to return completed FMLA forms. (Doc. # 13-7 at 39-40). Protective made it clear at that time that Plaintiff's employment could be terminated if she did not meet the requirements of her new position. (Doc. # 13-1 at 35, 40). After receiving this two month performance report, Plaintiff asked Mr. West if she could return to her old position on the Support Team. She was informed that there were no open positions, and that after she left her old position the team had been downsized from 12 to 6 employees. (Doc. # 13-1 at 40-41).

In the twelve-month period leading up to her termination on November 23, 2009, Plaintiff accumulated at least 20 attendance policy violations. Plaintiff was aware that Protective's policy provided that eight attendance violations could lead to termination.[2] (Doc. # 13-9 at 13-14; Doc. # 13-1 at 14). Given Plaintiff's excessive number of attendance violations and poor performance reports, on November 23, 2009 Protective made the decision to terminate her employment, but delayed the termination meeting until December 2, 2009 in order to avoid the breaking bad news before Thanksgiving. (Doc. # 13-10 at 3).

Prior to the termination meeting at approximately 2:30 p.m. on December 2, 2009, Ms. Nichols and Ms. Lent met in Ms. Lent's office to prepare. During that time, Plaintiff apparently received her FMLA forms from the doctor's office and placed them on the chair in Ms. Nichol's office. Protective has presented undisputed evidence that neither Ms. Lent nor any other HR employees were aware that Plaintiff had turned in the completed forms until she raised the issue during the termination meeting. (Doc. # 13-1 at 39; Doc. # 13-10 at 3-4; Doc. # 13-11 at 9). At the

---

[2] Plaintiff actually had 27 recorded violations but disputes several of the "Tardy" violations that occurred on staffing days. Construing the facts in the light most favorable to Plaintiff, she still had 20 undisputed violations. (Doc. # 13-9 at 13-14).

5

termination meeting, Plaintiff was informed that her employment was terminated due to her poor job performance and attendance violations. (Doc. # 13-10 at 3-4; Doc. # 13-11 at 9).

On June 3, 2010, Plaintiff timely filed a Charge of Discrimination with the EEOC, which issued a No Cause finding on November 26, 2010. (Doc. # 2). Plaintiff initiated this case against Protective on February 24, 2011. (Doc. #1).

**II.    SUMMARY JUDGMENT STANDARD**

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *See id.* at 323. Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *See id.* at 324. Thus, although a court may not grant summary judgment simply because a motion goes unopposed, it may do so if the moving party has shown that there are no disputed material facts and that it is entitled to judgment as a matter of law.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Fitzpatrick v. City of Atlanta*,

2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

## III.   DISCUSSION

### A.   Protective is Entitled to Summary Judgment on Plaintiff's Claim Under Section 2615(a) of the FMLA

Plaintiff alleges in her Amended Complaint that she was "denied full benefits and rights under the FMLA." (Doc. # 2 at 4). Courts have generally recognized two types of claims under the FMLA, 29 U.S.C. § 2615(a): "interference claims, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act, . . . and retaliation claims, in which an employee asserts that his employer discriminated against him because he engaged in an activity protected by the Act." *Strickland v. Water Works and Sewer Bd. of the City of Birmingham,* 239 F.3d 1199, 1206 (11th Cir. 2001). Here, Plaintiff has asserted an interference claim,[3] and to succeed on it, she must show that she was entitled to a benefit which she was denied. *Strickland,* 239 F.3d at 1206-07.

FMLA regulations allow employers to require employees to provide "complete and sufficient certification" from a medical source before granting FMLA leave. 29 C.F.R. § 825.305(c) (2012). Employers may also require an employee on FMLA leave to provide new certification for each subsequent leave year. 29 C.F.R. § 825.305(e). Failure to provide such certification is sufficient grounds for the employer to deny FMLA leave. 29 C.F.R. §§ 825.305(d), 825.313(b)-(c).

---

[3] Plaintiff's FMLA claim can more accurately be classified as an interference claim because Plaintiff did not include any language in Count One that can be construed as an allegation of retaliation. (Doc. # 2 at 4).

Protective's FMLA policy makes clear that an employee seeking FMLA leave must return the medical certification "15 calendar days" after her first day away from work. (Doc. # 13-2 at 2). Plaintiff was aware of Protective's FMLA policy because she had requested and been granted FMLA leave in prior years. (Doc. # 13-1 at 12-13). Indeed, Plaintiff even told her doctor in a letter dated March 25, 2008, "If Protective doesn't receive these forms periodically, they can terminate my employment." (Doc. # 13-3 at 9).

The undisputed evidence shows that Protective provided Plaintiff with FMLA forms on three separate occasions, during the time period from September through November 2009. (Doc. # 13-1 at 29-30). Throughout that time, Protective told Plaintiff to return the forms in a timely manner, and finally set a deadline for her to do so of November 10, 2009. (Doc. # 13-1 at 29-30, 35; Doc. # 13-7 at 14). Plaintiff failed to return the forms in a timely manner. During this period, Plaintiff incurred 21 attendance violations. (Doc. # 13-9 at 13-14). Although Plaintiff eventually returned the forms on December 2, 2009, the forms were still turned in not only well after the November 10 deadline, but also after the November 23 decision had been made to terminate her employment. (Doc. # 13-1 at 39; Doc. # 13-7 at 14; Doc. # 13-10 at 3). Protective provided Plaintiff with roughly three months to produce the required FMLA forms, even though the policy required her submission to take place within 15 days. (Doc. # 13-2 at 2). This evidence does not support any inference that Protective interfered with Plaintiff's FMLA rights. Rather, it shows repeated attempts to assist Plaintiff in exercising her FMLA rights. The ball was clearly in Plaintiff's court and she failed to do what was required of her. Accordingly, Protective has established that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law on Count One of Plaintiff's Amended Complaint.

### B.  Protective is Entitled to Summary Judgment on Plaintiff's ADA Claims Alleging Discrimination Based on Her Disability

Title 42 U.S.C. § 12112(a) provides that no covered employer "shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." Plaintiff alleges under the ADA that she was discriminated against by Protective because she was (1) fired instead of reassigned to her old job, (2) "singularly denied access to employee training classes and associated training materials," (3) "required to execute a unique training assignment and meet its particular productivity requirements," and (4) denied overtime. (Doc. # 2 at 4). In order to establish a *prima facie* case for disability discrimination under the ADA, Plaintiff must show that (1) she has a disability; (2) she is a qualified individual; and (3) she was discriminated against because of her disability. *See Morisky v. Broward Cnty.*, 80 F.3d 445, 447 (11 th Cir. 1996).

#### 1.  Plaintiff Has Not Established a Prima Facie Case of Disability Discrimination

Based on the record evidence before the court, it is clear that Plaintiff has failed to satisfy all three of the elements necessary to establish a *prima facie* case under the ADA. First, Plaintiff's only evidence of her alleged disability are two FMLA forms filled out by her doctors. The first form, dated March 25, 2008, states that Plaintiff is "[n]ot presently incapacitated," and usually suffers from her condition "in the afternoons after prolonged sitting." (Doc. # 13-3 at 15-19). Similarly, the second form, dated December 2, 2009, states that Plaintiff's condition requires her "to get up every few minutes [and] walk" and that she "should be able to work except on days visiting" the doctor as long as she "takes medicine as prescribed." (Doc. # 13-9 at 17-18). This evidence does not support

the conclusion that Plaintiff was disabled within the meaning of the ADA. Nor does it establish that she suffered from "a physical or mental impairment that *substantially* limits one or more *major* life activities." 42 U.S.C. § 12102(1)(A) (emphasis added). Therefore, the evidence does not establish the first element of Plaintiff's *prima facie* case, that she is disabled.

Moreover, even assuming (for the purpose of summary judgment) that Plaintiff had a substantially limiting impairment under the ADA, Plaintiff cannot establish the other elements of her *prima facie* case including the second element. A "qualified individual" under 42 U.S.C. § 12111(8) of the ADA is one who "can perform the essential functions of the employment position that such individual holds or desires." In determining what functions are "essential," deference is given to what the employer considers to be the essential functions, especially when it prepares "a written description before advertising or interviewing applicants for the job." 42 U.S.C. § 12111(8) (2012). In this case, Protective's Attendance Policy, which applies to all Protective employees, clearly states why attendance is important, what constitutes an attendance violation, and that repeated violations may result in "termination of employment." (Doc. # 13-2 at 10-11). Plaintiff testified that she was aware of this policy as far back as July 2, 2008, when she was reprimanded for other attendance violations. (Doc. # 13-1 at 14). It is undisputed that Plaintiff was aware of how important attendance was, and that Protective considered it to be an "essential function" of the job she held. Thus, Plaintiff's repeated attendance violations establish that she was unable to fulfill this essential function of her position.

Finally, Plaintiff was also unable to meet the productivity requirements of her job on the Special Processes Team. Throughout her time training for the Special Processing Team, Plaintiff's monthly productivity never met the required standard. (Doc. # 13-1 at 39). Before accepting the job

on the Special Processing Team, Plaintiff was aware that the productivity was very important to Protective. (Doc. # 13-1 at 7-8). While on the Support Team, Plaintiff was required to maintain at least an 100% productivity rating. (Doc. # 13-1 at 7). During the interview process for the Special Processing Team, Plaintiff was informed of the training plan and told that she would be required to pass each level of training before moving onto the next. (Doc. # 13-1 at 19). Plaintiff did not ask any specific questions about the productivity requirements because "I already knew how to do most of it anyway, so I figured it wouldn't take very long, you know, before I would actually do special-processing work." (Doc. # 13-1 at 20-21). Despite her faith in her abilities, Plaintiff was unable to perform these essential functions of the Special Processing position.[4]

In addition to not establishing a prima facie case of disability termination, Plaintiff has also failed to prove that she was discriminated against because of her disability in other areas. The Eleventh Circuit has held that any alleged discrimination in an employment context must be an "adverse employment action" which causes a "serious and material change in the terms, conditions, or privileges of employment." *Chapman v. United States Postal Serv.*, 442 Fed. Appx. 480, 484 (11th Cir. 2011) (quoting *Crawford v. Carroll*, 529 F.3d 961, 970-71 (11th Cir. 2008)). As explained below, outside of her termination, Plaintiff cannot show that she suffered an adverse employment action.

### a. Protective's Denial of Overtime was Not an Adverse Employment Action

Protective's action in temporarily denying Plaintiff overtime does not rise to the level of an adverse employment action. Protective indicated that Plaintiff would be eligible for overtime after

---

[4] Plaintiff has utterly failed to produce any (much less substantial) evidence that she was discriminated against due to her disability in training (Count Three) or productivity (Court Four).

finishing her training. (Doc. # 13-1 at 170-72; Doc. # 13-11 at 4). Merely denying overtime during training is a reasonable condition on the receipt of an employment privilege. It does not constitute a "serious and material change" in the terms of employment. Rather, it was merely a minor and temporary change or condition during Plaintiff's training. Therefore, Protective is entitled to summary judgment on Count Five of Plaintiff's Amended Complaint.

### 2. Protective had Legitimate Nondiscriminatory Reasons for its Decisions

Assuming arguendo that Protective's other alleged discriminatory actions in (1) terminating Plaintiff's employment in lieu of reassignment; (2) denying her access to training materials and classes; and (3) giving her a unique training assignment and productivity requirement could rise to the level of adverse employment actions, Plaintiff has failed to establish that these actions were taken because of her alleged disability. Moreover, Protective has provided legitimate, nondiscriminatory reasons for each of its actions. *See McDonnell Douglas Corp. v. Greene*, 411 U.S. 792, 802 (1973). Thus, the burden shifts back to Plaintiff to prove by a preponderance of evidence that Protective's proffered reasons are merely a pretext for discrimination. *Id.* at 804.

#### a. Termination

Protective has presented undisputed evidence that it terminated Plaintiff's employment due to her attendance violations and failure to meet the productivity requirements of her position. As previously mentioned, Plaintiff incurred at least 20 attendance policy violations in the year leading up to her termination, and she never reached the productivity standard in her new position. (Doc. # 13-9 at 13-14; Doc. # 13-1 at 39). Furthermore, Protective has established that there were no other positions available at the time Plaintiff was terminated. (Doc. # 13-1 at 41; Doc. # 13-10 at 3). Thus, Plaintiff could not have been reassigned to her old position. These are legitimate nondiscriminatory

reasons for Plaintiff's termination. Plaintiff has not even attempted to show that those reasons are a pretext for discrimination. Therefore, Protective is entitled to summary judgment on Plaintiff's termination claim.

### b. Training

Before accepting the position on the Special Processing Team, Plaintiff was given a training plan indicating the multiple phases of her training. (Doc. # 13-4 at 19). Although Plaintiff had not completed her initial training on the Quick Response Team, Protective granted her request to cross-train with her fellow team members, but told her not to do the homework for those classes. (Doc. # 13-1 at 48). Based on Plaintiff's Amended Complaint and statements made during her deposition, Plaintiff apparently sees Protective's decision to deny her homework for the cross-training classes as discriminatory. Protective has established that the homework was denied until Plaintiff "was up to speed on the other areas" of her training. (Doc. # 13-11 at 4). Because Plaintiff was failing to meet the productivity requirements of her initial training, it was legitimate and nondiscriminatory — rather than adverse and discriminatory — for Protective to have instructed Plaintiff to refrain from undertaking homework. Analogously, it makes no sense to demand (or pay for) homework in the area of trigonometry when one has not mastered the basics of arithmetic.

Plaintiff also complains that her training plan was discriminatory in that it was uniquely designed and demanding. (Doc. # 2 at 4). However, Protective has presented evidence that Plaintiff was the first person to go through this new training and that all similarly situated employees hired after Plaintiff's termination have gone through similar training. (Doc. # 13-11 at 3). These legitimate nondiscriminatory reasons for Plaintiff's training plan remain undisputed, and Plaintiff has presented no evidence that they are a pretext for a discriminatory motive on the part of Protective. Accordingly,

Protective has shown that it is entitled to summary judgment on Counts Three and Four of Plaintiff's Amended Complaint.

### 3. **Protective Provided Reasonable Accommodations to Plaintiff**

In her Amended Complaint, Plaintiff does not expressly allege that Protective failed to provide reasonable accommodations for her alleged disability. However, Counts Two through Five could be construed as stating such a claim. Under the ADA, an employer must make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." 42 U.S.C. § 12112(b)(5)(a). As previously discussed, Plaintiff is not a qualified individual with a disability. Nonetheless, the Rule 56 record makes clear that Protective did indeed provide assistance with respect to Plaintiff's medical issues. Protective allowed Plaintiff to take breaks to get up from her chair to stretch. (Doc. # 13-1 at 12, 28-29). Protective also bought a special ergonomic chair for Plaintiff to support her back, and arranged for a specialist, Michele Pawlik, to check out Plaintiff's desk to ensure that its layout was ergonomically correct. (Doc. # 13-6 at 21; Doc. # 13-10 at 3).

It is axiomatic that any (even phantom) failure-to-accommodate claim necessarily fails if a plaintiff does not specifically ask for an accommodation during her employment. *See Gaston v. Bellingrath Gardens & Home*, 167 F.3d 1361, 1363-64 (11th Cir. 1999) (per curiam). The only accommodation that Plaintiff even arguably asked for with any specificity during her employment was reassignment to her old position. But even assuming Plaintiff was disabled, reassignment is not considered a reasonable accommodation when there are no positions available. *See Reed v. Heil Co.*, 206 F.3d 1055, 1062 (11th Cir. 2000) ("[r]eassignment is only a reasonable accommodation if a position for which the plaintiff is qualified is available."). Thus, Protective has shown that it

provided all reasonable requests for assistance and had a legitimate nondiscriminatory reason for denying Plaintiff's request for reassignment, which Plaintiff has not shown was a pretext for discrimination. Therefore, Protective is entitled to summary judgment on Plaintiff's inferred reasonable accommodation claim.

## IV. CONCLUSION

Because Plaintiff failed to establish a *prima facie* case under the FMLA and the ADA, the court concludes that Defendant Protective's Motion for Summary Judgment (Doc. # 11) is due to be granted. An order consistent with this Memorandum Opinion will be entered separately.

**DONE** and **ORDERED** this \_\_\_\_6th\_\_\_\_ day of July, 2012.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE